V. E. CUMMINS v. SOUTHERN FRUIT COMPANY, INCORPORATED, AND E. H. BARBER.

(Filed 28 November, 1945.)

**1. Negligence §§ 11, 19b—**

The task of the reviewing court, on defendant's motion for judgment as of nonsuit on the ground of plaintiff's contributory negligence, is not merely to determine from the weight of the evidence, however convincing, whether plaintiff was negligent—that would be for the jury; but to say whether his contributory negligence is so clearly apparent that no person with a reasonable mind could draw any other inference.

**2. Automobiles § 8—**

The duties of those using the highways are correlative. While the rule of the ordinarily prudent man is not changed as a standard of conduct, certainly the ordinarily prudent man must be permitted to put some reliance on compliance with the most common and ordinary laws or rules established for his protection.

**3. Automobiles §§ 18c, 18g—**

In an action by plaintiff to recover from defendants for injuries allegedly caused by defendants' negligence, where all of the evidence tended to show that defendants' mud-spattered truck was parked, headed north, about 6 a.m. on a dark, foggy morning, with all four wheels on the pavement in the right-hand lane of a two-way highway, without lights, flares, or any other mode of signal, G. S., 20-161, and had been so parked for some time, apparently unattended, and that plaintiff, driving a truck north at about 30 to 35 miles per hour, was compelled to dim his lights, when about 20 feet south of defendants' truck, in response to the dimmed lights of an oncoming car in order to pass same, G. S., 20-181, the lights of this car partly blinding plaintiff, who collided with the rear of defendants' truck, causing the alleged injuries, motion for nonsuit at the close of all the evidence, on the ground of contributory negligence, was properly refused.

**4. Automobiles §§ 11, 14—**

The operator of a motor vehicle is not required to anticipate that an unlighted, unguarded vehicle is standing in his path on the highway at night; nor can he be held for contributory negligence because he did not stop, when momentarily blinded by the lights of an oncoming vehicle, nor because the rays of his lights, dimmed in response to those of a passing car, did not pick up the body of the unlighted vehicle so parked on the highway.

BARNHILL, WINBORNE, and DENNY, JJ., concur in result.

APPEAL by defendants from *Hamilton, Special Judge,* at April Extra Civil Term, of MECKLENBURG.

This is an action to recover damages for personal injury sustained in a collision on the Concord-Charlotte Highway between a truck driven by plaintiff and one owned by the corporate defendant and being operated by its servant. The plaintiff recovered in the court below, and defendants appealed. The only question presented on the appeal is whether nonsuit should have been granted in the court below on the ground of plaintiff's alleged contributory negligence, which it is contended is shown in his own evidence.

Pertinent to this contention, the facts, as stated in plaintiff's evidence, are as follows:

R. V. McCombs testified for plaintiff that witness worked in Burlington and drove back and forth to his work. On this occasion he was driving south and the bakery truck driven by plaintiff was going north. Witness saw the fruit truck parked on the highway headed toward Concord, all four wheels; no sign of light. It was dark, foggy, rainy; it was between 6:00 and 6:15 o'clock in the morning. The car in which witness was riding and plaintiff's truck were meeting.

"The car I was riding in at the time of the collision I would say was 15 feet from the parked truck when the collision occurred, south of the parked truck I'd say a car length. My judgment is that Mr. Cummins' truck was running thirty miles an hour. There were no lights of any kind, buoys, or anything on the road to give warning to the public that this truck was there. We didn't see the truck ourselves until we was just right on it. I couldn't say whether anybody was in the truck. As we stopped our car I would say within one hundred and fifty or two hundred feet we stopped and walked back to the scene of the accident, and I imagine it taken us two or three minutes to get back and this colored fellow that was driving, he was just getting out of the truck. Of course we went running back and he was rubbing his eyes and said 'Someone ran into me.' We seen a sack of potatoes and it was so dark we thought it was a person laying there. It was laying in the highway. The

colored man was coming to the back of the truck. He was along beside the parked truck. He said 'Someone ran into me.' I says 'No wonder.' He didn't tell me what his name was. I didn't ask the name. I said 'Why don't you get that thing off the highway.' He said he didn't get off because he was afraid he'd stick up. I could see the shoulder of the road to the right of where the truck was parked clearly after we stopped. He had sufficient room to get the truck off of the highway onto the shoulder, though it was very muddy. It had been raining for about a day and night at that time. He had sufficient room. I told him I'd rather pull it out in the field. When I saw him he was walking back towards the bakery truck that ran into him. He was just rubbing his eyes. He didn't appear to be one bit hurt. I had never seen Mr. Cummins before. Today is the first time I ever spoke to him. I thought he was a dead man at the time I saw him. We tried to get him from the wrecked truck and we couldn't get the doors open, and then we went from the back of the bakery truck and unloaded his pies and everything he had in it and prized the seat loose from behind."

On cross-examination:

"It was very dark and foggy and misting. It was very difficult to see any distance in front of you. I would say we were traveling thirty to thirty-five, somewhere along there. It was almost impossible to go any faster, the condition of the weather. I couldn't give you a definite feet how far in front of you that you could see that morning, but you couldn't see too far. You can imagine yourself what you can see on a foggy morning. It was very foggy; that would just be hard to make an estimation of that. It was a kind of a fog and mist together there. The trucks was not together. I would say they were 20 feet apart at the time. I don't know whether the fruit truck moved up or whether the pie truck bounced back off of it. . . . The darky didn't say when the lights went out. I asked him why he didn't put some flares out. He said he didn't have any. He made no statement. The road there was wet. It was not only a heavy fog, but there was a mist with it. I made no examination of the marks or anything of that kind. I don't know whether there were any skid marks on the road or not. My attention was first attracted to the pie truck as we were going south, we saw the truck and we made the statement, said 'someone's going to hit that truck, there sits a truck with no lights,' and we saw this approaching car, or truck rather, of course we didn't know what it was, otherwise, we saw the lights of the truck. That was the pie truck. When we first saw that, I would say we was 50 or 75 feet from this parked truck, and just as we got even with it I said 'There's the first one hits it,' that's the statement I made, I said 'There's the first one hits it,' and it just crashed at the time. I couldn't tell whether the pie truck slowed up. It was very poor vision there, but I couldn't say

whether it slowed up or not. The crash is all I heard. . . . The pie truck passed us about fifteen feet south of the truck that was standing on the road. That's when I got the impression as to its speed, approaching it would be hard to say what it was, just my estimation. I would say he was going approximately 30 miles an hour. That is when the pie truck was within fifteen feet of the rear of the truck my opinion is he was making 30 miles an hour. I can't tell how fast he was running down the road because I couldn't see except the lights. To my estimation he was going at a very moderate speed. It was 'most impossible to go fast on a morning like that. I would say as he passed he was going in my opinion about 30 miles an hour. I'd say it would be approximately 30."

Clay Long testified for plaintiff:

"I was driving the car coming south to go to the Rubber Plant on this particular night. Mr. McCombs was in the front seat with me. Out here about seven miles from town. I saw the truck that was standing still on the highway. All four wheels of that truck was on the road. No lights on it at all. There were not any signals or buoys in front or back of it to warn people that it was there. I'll say the parked truck was 50 or 75, probably a 100 feet back when I first saw it. At that time I saw this approaching car driven by Mr. Cummins. We were meeting each other. My car at the time that Mr. Cummins' car hit the truck was about the length of the car past the parked truck. I stopped. The lights on Mr. Cummins car looked like they were good. When I first saw the darky he was coming from the parked truck back towards the wreck. I never did speak to him at all. Mr. McCombs talked to him. I saw Mr. Cummins, I didn't know him prior to that time. I saw the darky rubbing his eyes. I noticed to the right of his parked truck the shoulder of the road. There was room enough for him to get the truck off and park it on the side of the road. There were no other lights, street lights or anything like that. It was in the country. . . . As we approached this parked truck, although its headlights were not burning, the lens of its headlights were facing us; that's the first thing I could see of the parked truck, my lights reflecting on the lens of the headlights of the parked truck. That's the first I seen of the truck, then I seen the bulk of the truck as I approached. I couldn't state the speed of Mr. Cummins' truck, but he was running I think within the law, around 30 miles an hour. I don't know Mr. Cummins. . . . I will say I was within about 75 or 100 feet probably of this parked truck when my lights were reflected on the lens of its headlights. I was maybe forty feet away. I couldn't say exactly, before I could tell exactly what it was parked on the road. I was about the length of the car that I was driving past the truck when the collision occurred. When the collision occurred, I was about the length of my car past the truck; so that the crash came

when I was a few feet from the back of the truck. I did not have my bright lights on. I dimmed my lights for Mr. Cummins and he dimmed his lights. As I approached, Mr. Cummins evidently saw me because he dimmed his lights, and I dimmed my lights as we approached. We both dimmed our lights. . . . The weather was misty, foggy and drizzling rain. It was real dark. The pie truck and the fruit truck when I got out and went back were approximately 20 feet apart. The fruit truck was approximately twenty feet farther north than the pie truck. I don't know which one moved, whether the pie truck went backwards or the fruit truck forward."

Mr. N. G. McGuirt testified for plaintiff:

"On this morning I had occasion to go out on the Concord Road, going to Concord. It was between five-thirty and quarter of six. I saw this truck of the defendant Fruit Company. It was sitting on the highway, headed towards Concord, north. There was no car coming meeting me at that time. I almost hit the truck myself; there wasn't any lights. It didn't have any lights on it. Didn't have any lights about it. I said something to the colored man in the truck but he didn't hear me, I don't imagine. He was in the truck. All of the truck was on the hard surface. At that particular point that just a two-lane highway."

V. E. Cummins, the plaintiff, testified:

"On the morning of September 29, 1944, I left Charlotte between ten and fifteen minutes to six. I was driving a Dodge half-ton truck. Nobody was with me. Had my truck loaded with pies—a one-half ton panel truck. I was going to Concord to deliver bakery goods, pies. The weather was rainy and foggy. I was proceeding on Highway 29-A when the collision occurred. I was going north on Highway 29-A, alternate. At the point of collision I would say the pavement is about 20 feet wide. The hard surface. The shoulder was about 12 feet wide."

Plaintiff testified that he was going about 35 miles an hour. The truck was in the right-hand lane, entirely on the hard surface, without lights, and there were no flares, or other sign to indicate its presence. He saw the truck when he was about 25 feet from it. The truck was a sort of grayish color, with mud and road film on it to such an extent as to make it hard to distinguish. The body of the truck was about 3½ feet above the surface of the highway and plaintiff's lights shined under it and didn't show the body up. Plaintiff immediately cut to the right and tried to apply the brakes, and the collision occurred. Plaintiff was pinned in the truck beneath the steering wheel and became unconscious.

On cross-examination plaintiff testified that it was rainy and dark and foggy. Possibly his lights might show an object some one hundred feet away. He did not see the truck until just before the collision. His lights were good.

The plaintiff testified that as he was a short distance south of the parked truck, his vision was momentarily obscured by the headlights of an approaching car which "sorta blinded" him, "kinda blinded" him and cut off vision of the truck, and that he may have proceeded in this way a few feet, twenty or twenty-five; and responded to a question addressed to him on cross-examination that at that moment, if he had hit the truck, he "wouldn't have seen it." He "went for the brakes" and cut to the right as soon as he saw it.

"The other truck was a large truck, I imagine about a ton and a half. It looked like it was a sort of grayish color with mud or road scum thrown up from the tires. Nobody ever showed me the case of *Williams v. Fredrickson Motor Express.* That was on level ground. I was approaching that truck on an absolute level. I dimmed my lights right about the same time the other car dimmed theirs. When I did that, I couldn't very well tell how far I was from the approaching car on account of the fog and rain. I knew some distance before I passed the approaching car that there was a car approaching me. I knew that I was running with dim lights or slanting, passing lights. I didn't cut off my main lights altogether. They are not the dim lights, they are the passing lights, it's a slanting ray that you use when you pass a car. When I dimmed my lights and the other car dimmed its lights, I knew that I was running through the fog handicapped as far as seeing in front of me. The pavement was wet. My brakes were good. I have no idea within what distance I could stop the car out there that night. After I had dimmed my lights, I could see an object on the road possibly 100 to 150 feet; that is, after slanting or dipping my lights. . . . I drive, try to drive, in the middle of the lane, and it was immediately in front of me. I judge I was within about 25 feet of it when the Long car passed. . . . I did not see anybody in the highway before getting to this truck." Plaintiff then presented evidence of his injuries and their extent.

The defendant put on evidence mainly relating to the question of negligence and the injury of plaintiff. At the end of plaintiff's evidence, and again at the conclusion of all the evidence, defendant demurred to the evidence and moved for judgment of nonsuit, which was declined.

There was a verdict in favor of plaintiff, and judgment thereupon, and defendants appealed, assigning as error the refusal to grant their motion of nonsuit on the ground of the alleged contributory negligence of the plaintiff.

*Jones & Smathers for defendants, appellants.*

*G. T. Carswell, John M. Robinson, and Hunter M. Jones for plaintiff, appellee.*

SEAWELL, J.   The appellants base their contention that plaintiff was contributorily negligent very narrowly on the fact that he did not stop or cut down his rate of travel, which was not unlawful, when meeting and passing another car, about 25 feet from the defendants' truck, which was parked without lights or flares in the center of the right-hand lane over which plaintiff had the right of way.   At that point, defendants contend, the plaintiff was momentarily blinded by an approaching car; and his negligence in not stopping is therefore a contributing approximate cause of his injury.   A much broader view of the occurrence and its component and related factors is necessary to determine whether the plaintiff failed to exercise ordinary prudence under the circumstances and conditions which prevailed at the time of the collision.   In this respect, the task of the reviewing court on the question of contributory negligence is not merely to determine from the weight of the evidence, however convincing, whether plaintiff was negligent—that would be for the jury; but to say whether his contributory negligence is so clearly apparent that no person with a reasonable mind could draw any other inference.   *Neal v. R. R.,* 126 N. C., 634, 36 S. E., 117; *Hayes v. Western Union Telegraph Co.,* 211 N. C., 192, 193, 189 S. E., 499; *Godwin v. R. R.,* 220 N. C., 281, 17 S. E. (2d), 137; *McCrowell v. R. R.,* 221 N. C., 366, 374, 20 S. E. (2d), 352.

The development of the laws of the road since the advent of the motor vehicle has proceeded on one theory: that the duties of those who use the highway are correlative.   The law has never put on the traveller the impossible task of protecting himself solely by his own circumspection against every danger that may beset him on the highway through its use or abuse by others, thus making him an insurer of his own safety.   Reasonable provisions in the laws for the protection of travel on the highways enter into and become a part of the measure of prudent conduct on the part of those who are compelled to use them in common with others. While the rule of the ordinarily prudent man is not changed as a standard of conduct, certainly the ordinarily prudent man must be permitted to put some reliance on compliance with the most common and ordinary laws or rules established for his protection, or be driven from the road; and unless this correlative principle is recognized in its bearing upon the rule of prudence, those for whose protection the laws were made must proceed with as high a degree of care as if they never existed—a thing impossible under modern conditions, and nowhere observed.

There are two applications of this principle appropriate to this case:

1. The plaintiff was not required to anticipate that the defendants' truck would be parked with all four wheels on the pavement in the right-hand lane of travel without lights, flares, or any other mode of signal or warning.   G. S., 20-161.   That it was so parked, and had been so parked

for a considerable time is clear from plaintiff's evidence, notwithstanding partial contradiction from the corporate defendant's driver. A witness saw it in that condition a considerable time before the collision, called to the colored man in the truck, and got no response. Moreover, as one of the factors tending to the plaintiff's undoing, the truck showed up merely as a mud-spattered, film-covered, gray shape, so merged in the gray background of road and mist as to be unnoticeable except at close quarters.

2. The plaintiff proceeded a few feet within the blinding glare of an approaching car. Both cars dimmed or slanted the headlights in passing as they are required to do. G. S., 20-181. It is contended that plaintiff was contributorily negligent in not reducing his speed or stopping altogether at this point. He was then almost at the crisis of the affair, and whether he could have diminished the force of the collision or have avoided it altogether is a matter of speculation, or at least of fact about which reasonable minds might differ. *Leonard v. Transfer Co.,* 218 N. C., 667, 12 S. E. (2d), 729; *Cole v. Koonce,* 214 N. C., 188, 198 S. E., 637; *Williams v. Express Lines,* 198 N. C., 193, 151 S. E., 197; *Clarke v. Martin,* 215 N. C., 405, 2 S. E. (2d), 10; *In Buohl v. Brewing Co.,* 349 Pa., 377, 37 A. (2d), 524, the rule is laid down:

"The operator of a motor vehicle is not bound to foresee that another will permit his vehicle to stand on the highway at night without lights. *Nelson v. Damus Bros. Co., Inc.,* 340 Pa., 49, 51, 16 A. (2d), 18. We have consistently held that a fixed rule cannot be laid down which will determine in every instance the person legally responsible for a rear-end collision on a highway at night between a parked vehicle and one that is moving. *Nelson v. Damus Bros. Co., supra; Harkins v. Somerset Bus Co.,* 308 Pa., 109, 162 A., 163 (and other cases). Temporary blinding caused by bright lights on an oncoming or parked vehicle has been recognized as a legally sufficient excuse for failing to stop within the assured clear distance ahead. (Citing cases.) Under the decisions of this Court the trial judge properly submitted to the jury the question of appellee's contributory negligence."

In *Boor v. Schreiber* (Pa.), 33 A. (2d), 648, it is said:

"It is now settled by *Farley v. Ventresco,* 307 Pa., 441, 161 A., 534, that a driver is not bound to stop merely because he is 'blinded' by the headlights of another vehicle. . . . We are not prepared to say, as a matter of law, plaintiff should have anticipated defendants' 'blacked-out' truck lurking behind the curtain." But this much must be clear as a matter of law: he was not required even under those circumstances to anticipate that an unlighted and unguarded truck was in his path, or, in other words, to anticipate the gross negligence of the truck driver in this respect. *Hobbs v. Coach Co., ante,* 323, 34 S. E. (2d), 211. Nor can he be held for contributory negligence as a matter of law because he did not

stop when momentarily blinded, nor because the slanting or passing rays of his lights did not pick up the body of the truck, which stood some 3½ feet above the road. *Williams v. Express Lines, supra.*

The meeting of cars on a much used thoroughfare is a constant occurrence. That this should happen at a point involving other dangers is a coincidence frequently occurring, and the multiple consequences of the violation of this law, enacted for the safety of life and limb, may well be considered within its contemplation and its prevention within its purpose. The driver is not required to proceed as if he were apt at any moment to encounter an unlighted truck in his way. "A motorist may assume that no vehicle will be left standing on the main highway at night without a warning light." Blashfield, p. 341, sec. 1203. It should be understood that we are speaking on the question of ordinary care as applied to the facts of this case. Under the existing circumstances, the plaintiff could have sustained no injury save from the negligent parking of the truck—a negligence which he was not required to anticipate, but only to exercise ordinary care in its discovery and such means of avoidance as prudence might dictate when he became aware of it.

In factual features, the case is not unlike *Cole v. Koonce, supra,* and *Williams v. Express Lines, supra,* in which we held, and we repeat, that generally speaking on the question of the contributory negligence of the plaintiff, the matter must be decided upon the facts of the particular case; and in the case at bar we are unable to separate any item so unaffected by its attendant circumstances that we are able to declare with the positiveness required by the rule that there are no inferences favorable to the plaintiff on the question of contributory negligence. Under the circumstances, the conduct of the plaintiff on that issue was a matter for the jury, and they have spoken.

We find

No error.

BARNHILL, WINBORNE, and DENNY, JJ., concur in result.